Lauren **BRUBAKER** et al., Plaintiffs,

v.

Louis **MOELCHERT** et al., Defendants.

No. C–C–74–69.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Dec. 19, 1975.

**838**

George S. Daly, Jr., and Walter H. Bennett, Jr., Casey, Daly & Bennett, P. A., Charlotte, N. C., for plaintiffs.

Andrew A. Vanore, Jr. and Richard F. Kane, N. C. Dept. of Justice, Raleigh, N. C., for defendants.

## MEMORANDUM OF DECISION AND FINAL ORDER

McMILLAN, District Judge.

### SUMMARY OF FACTS

Plaintiffs are members of the United States Labor Party and the National Caucus of Labor Committees. They allege in their complaint that the defendants, officials of the University of North Carolina at Charlotte (UNCC), deprived them of their rights to freedom of speech, freedom of the press, freedom of peaceable association and equal protection of the laws, by preventing them from assembling and accosting people and distributing their newspaper, *"New Solidarity,"* at places and times of their choice on the Charlotte campus of the defendants during 1974. Relief sought includes temporary and permanent equitable relief and a declaratory judgment. Plaintiffs attack as unconstitutional, on their face and as applied, the University's regulations and policies which deal with use of campus buildings and property.

UNCC "POLICY STATEMENT #21" under the heading "REQUESTS FOR USE OF UNIVERSITY BUILDINGS OR UNIVERSITY PROPERTY" includes the following:

*"Policy*

The University encourages participation by the community in the University's programs and activities, and welcomes organizations to the campus for their meetings when their work is compatible with or supplementary to the educational outreach of the University.

Student and faculty organizations are likewise encouraged to make full use of the facilities the University has to offer when their meetings are a part of their University work, or a logical outgrowth of it.

*Regulations and Procedures*

(1) University buildings or campus spaces may not be used to raise

money for any individual or organization other than an officially recognized campus organization, either faculty or student, or a non-profit, charitable organization off campus, such as the United Way Campaign.

(2) Organizations intending to use the University's spaces to benefit an off-campus effort must be prepared to prove the tax-exempt status of the benefiting cause.

(3) All requests for campus spaces must have the written approval of the appropriate administrative official.

(4) Written confirmation will be sent to the requesting party and to the responsible official in the building to be used.

(5) A list of charges and rental rates will be available in the Office of Business Affairs, but payment of charges and rentals does not exempt any organization from any other pertinent regulations or procedures required by this statement.

(6) Reservations by faculty or staff organizations, or by non-profit charitable groups for space in University buildings or on University property will be made by the Conference Coordinator in the Institute for Urban Studies and Community Service. Reservations for chartered student organizations will be made through the Office of the Dean of Students.

(7) Space can be granted only to *bona fide* divisions of the University, or properly chartered organizations of the University. In the case of non-University groups, sponsorship by a University official or an officially recognized University group or division is required.

(8) The Conference Coordinator or the Office of the Dean of Students will clear the use of space with the appropriate official for the building to be used, or the Office of Business Affairs for open campus space. The officer may deny the request if the function is not appropriate to the building or space, subject to the usual lines of appeal.

(9) If a visiting speaker is to appear in the course of the program, the Visiting Speaker Policy must be followed, and proper clearance is necessary. Forms are available in the Office of Development.

(10) The sponsoring organization must sign for the space requested through its officers. Two signatures are required. If there is an off-campus organization or a group involved, a signature from a representative of that group will also be required.

(11) The space about the Belk Tower is not to be used for public meetings."

The Belk Tower is a bell tower or spire located centrally among the classroom and faculty buildings at UNCC.

During January, February and March, 1974, plaintiffs had various confrontations with various administrative officials of the University. At various times they distributed free copies of their newspaper, political leaflets, and handbills critical of the Rockefellers and the CIA. None of the documents are calculated to incite riot, and though somewhat strident in tone they are within the limits of permissible political comments. Such papers were distributed in the various public areas of the University and some were put in the mailboxes of professors. Some unwelcome visits were made to professors in their offices. At various times plaintiffs and their associates attempted to sell newspapers to those who would pay, although they gave them free to those who would not pay.

A local Charlotte newspaper during these times was sold through coin-operated cages, and another Charlotte newspaper was distributed to dormitories and also sold in individual copies to occasional customers.

The various confrontations described by the evidence included the following:

1. A security officer ordered a customer not to buy a paper from one of the plaintiffs, and placed one plaintiff under temporary arrest and told three of the plaintiffs that they could not distribute literature on the campus without permission.

2. Mr. Louis Moelchert, the Vice Chancellor, refused to discuss with the plaintiffs the possibility of allowing continued sale or distribution of their literature. On another occasion the plaintiffs had but did not keep an appointment to see Mr. Moelchert.

3. An Assistant Dean of Students restricted plaintiffs in the sale of their newspapers to the use of a table inside the Student Center, and would not allow them to distribute their papers outside.

4. Mr. Dennis Rash, Dean of Students, denied plaintiffs permission to distribute newspapers around the Belk Tower. Dean Rash suggested that if they did not have a student organization sponsoring them they could distribute and congregate only (a) with prior permission at a table inside the Student Center; (b) in the Student Book Store; or (c) through a selling cage such as that used by local daily newspapers. Dean Rash suggested that they would get arrested if they did not observe the regulations.

5. After talking with Dean Rash, the plaintiff Porter wrote Vice Chancellor Moelchert requesting certain rights to distribute literature. Several months later the request had not been answered. There was no specified or commonly accepted time within which such answers were required to be given.

These events are illustrations only of the contacts between plaintiffs and officials of defendants. No violence occurred at any time. The parties on both sides showed concern about the situation, and the good faith of neither plaintiffs nor defendants is in issue.

## CONCLUSIONS OF LAW

1. The court has jurisdiction of the subject matter of this action. 28 U.S.C. §§ 1343(3) and (4).

2. This action does not require determination by a three-judge district court, since only local, non-statewide regulations are involved.

3. The actions of defendants above described were done and taken under color of regulations, customs and usages of the State of North Carolina.

4. Plaintiffs have stated a claim under 42 U.S.C. § 1983.

5. Policy Statement No. 21, and its administration as shown by this record, are unconstitutional and in violation of the First Amendment.

6. Declaratory relief is appropriate.

## DISCUSSION OF LEGAL AUTHORITIES

█ Policy Statement No. 21 opens with this invitation for public use of the UNCC campus:

"The University encourages participation by the community in the University's programs and activities, and welcomes organizations to the campus for their meetings. . . ."

This invitation (which the court judicially notices to have been acted upon by various groups, speakers, forums, etc.) effects a dedication of the UNCC campus to the exercise of First Amendment rights.

█ The distinction which the University has drawn in Policy Statement No. 21, between sponsored or charitable (invited) and other (uninvited) persons and organizations cannot legally diminish the First Amendment rights of plaintiffs, since a partial dedication to First Amendment uses is effectively a dedication to the exercise of First Amendment rights by everyone. *National Socialist White People's Party v. Ringers*, 473 F.2d 1010, 1014–15 (4th Cir. 1973).

■■ UNCC may prohibit "advocacy . . . directed to inciting or producing imminent lawless action," *Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969), and may regulate "special, limited circumstances in which speech is . . . interlaced with burgeoning violence," *Carroll v. Princess Anne,* 393 U.S. 175, 180, 89 S.Ct. 347, 351, 21 L.Ed.2d 325 (1968). They may prevent plaintiffs from interfering with classes, and enforce other such reasonable rules regulating the time, manner and place of the exercise of First Amendment rights. *See, Southeasterm Promotions, Ltd. v. Charlotte,* 333 F.Supp. 345 (W.D.N.C. 1971), *Danskin v. San Diego School Dist.,* 28 Cal.2d 536, 171 P.2d 885 (1946). But Policy Statement No. 21 does not pass muster under any of these narrow exceptions. It sets up a prior restraint in its requirement that "all requests for campus space must have the written approval of the appropriate administrative official." In the application of this provision, a month or more elapsed without plaintiffs' request being determined, in violation of the requirement that a final decision after a prior restraint be available within a brief, specified period. *Tietel Film Corp. v. Cusack,* 390 U.S. 139, 88 S.Ct. 754, 19 L.Ed. 2d 966 (1968); *Freedman v. Maryland,* 380 U.S. 51, 58–59, 85 S.Ct. 734, 13 L. Ed.2d 649 (1965). This is the rule for both commercial and gratuitous distribution. *Tietel v. Cusack, supra.*

The distinction drawn in Policy Statement No. 21 between, on the one hand, student and faculty organizations, their invited guests, and charitable organizations, and on the other hand such outsiders as plaintiffs, is arbitrary. There was no evidence advanced at the hearing, and Policy Statement No. 21 reflects no determination, that such outsiders are more likely to cause disruption or refuse to obey reasonable restrictions on the time, place and manner of exercise of First Amendment rights than are the insiders. No reason appears for not giving plaintiffs the equal access to public University property which they seek. They do not seek "unrestricted use" of the UNCC campus, as defendants suggest; they merely seek equal treatment.

Advocates of ideas not popular enough to obtain invitation from an established organization to speak in a public place are those who most need their First Amendment rights; a popular or accepted idea or person seldom needs to call for First Amendment protection.

■ Defendants have advanced the suggestion that, because plaintiffs' activities are somehow infected with commercialism, they are beyond the pale of the First Amendment. *See Breard v. Alexandria,* 341 U.S. 622, 71 S.Ct. 920, 95 L.Ed. 1233 (1951). The commercial aspects of plaintiffs' activities at UNCC are, on this record, quite marginal. In *Breard,* the Supreme Court upheld the constitutionality of an ordinance which prohibited door to door solicitation, focusing on the clash between the freedom of dissemination of ideas and the householder's right of privacy. The only comparable clash in this case is between the right to disseminate ideas and the right of students and professors to conduct classes free from interference. Otherwise, the comparison is flawed. The UNCC campus is a public place with respect to the First Amendment, not a private doorstep. The present case is closer to *Martin v. Struthers,* 319 U.S. 141, 63 S.Ct. 862, 87 L.Ed. 1313 (1943), where a municipal ordinance prohibiting anyone from summoning the occupant of a house to the door to receive free religious literature was held to violate the First Amendment.

■ University "Traffic" Regulations prohibiting advertising and littering were pleaded in the complaint, and some of plaintiffs' testimony indicated that they had been threatened with consequences under these regulations. No firm identification of the regulations pleaded was made at the hearing, and therefore no order is made with respect

to them. However, the discussion above regarding the claim of commercialism appears to dispose of any claim that a regulation prohibiting advertising could constitutionally be applied to prevent plaintiffs from distributing their newspapers; and as to the prospect of suppression because of the administration's fear of littering, in *Schneider v. State, infra,* 308 U.S. at 162, 60 S.Ct. at 151, the Supreme Court said: "We are of opinion that the purpose to keep the streets clean and of good appearance is insufficient to justify an ordinance which prohibits a person rightfully on a public street from handing literature to one willing to receive it." Plaintiffs can be held responsible only for their own littering, not for that of others.

■ The present case is not distinguishable from *Lovell v. Griffin,* 303 U. S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), where a local ordinance provided that one could not pass out leaflets, even gratuitously, without securing the permission of the City Manager. Policy Statement No. 21 effectively provides that a non-charitable outsider may not leaflet without permission of a recognized student or faculty organization, and the open spaces at UNCC, having been dedicated to First Amendment use, are the functional equivalent of the municipal open spaces of *Griffin.* See also, *Jamison v. Texas,* 318 U.S. 413, 63 S.Ct. 669, 87 L.Ed. 869 (1943); *Schneider v. State,* 308 U.S. 147, 60 S.Ct. 146, 84 L. Ed. 155 (1939); *Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

■ Finally, Policy Statement No. 21 is void for vagueness. The opening paragraph invites the community to use UNCC when "their work is compatible with or supplementary to the educational outreach of the University." Paragraph 8 allows a request for use of campus space to be denied "if the function is not appropriate to the building or space." These provisions give the responsible administrative official an unchecked discretion to decide which uses of campus space are to be allowed, and such an ambit of power is unconstitutionally vague, *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Coates v. Cincinnati,* 402 U.S. 611, 91 S. Ct. 1686, 29 L.Ed.2d 214 (1971); *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969); *Dickson v. Sitterson,* 280 F.Supp. 486 (M.D.N.C.1968).

UNCC may, of course, make reasonable charges for use of its classrooms and auditoriums, and may prevent disruption of its classes. It may not, however, treat plaintiffs differently from others with respect to the exercise of First Amendment rights.

## CONCLUSION

After the hearing several conferences occurred among lawyers and between court and lawyers over the possibility of amendments to the policy statement. The University officials have not formally revised the policy statement. However, they have drafted and requested comment of the court on a proposed revision, and the court welcomes that proposed revision (copy attached) as an appropriate vehicle for the resolution of matters at issue.

■ The revised policy statement makes several significant changes and, in the court's opinion, eliminates the chief constitutional problems with the existing statement. The revised policy statement: (a) Establishes uniform procedures and standards for those desiring to solicit funds and uniform locations for such solicitations; (b) Allows the distribution of non-commercial written materials to be done in the open areas by anyone without permission or advance approval; (c) Permits assemblies of groups, whether or not University affiliated, to be conducted without sound amplification in the Cone University Center Plaza and the Residence Hall Cafeteria Plaza; (d) Allows assemblies in other areas upon written request at least forty-eight hours in advance to a designated office and telephone number,

with approval assumed if no answer is received within thirty-six hours; (e) Provides a right of appeal to the Chancellor with a forthcoming decision required at least six hours before the scheduled event.

In the opinion of the court these changes if adopted will so radically alter the constitutional problems raised by the original POLICY STATEMENT #21 that they will render this case moot. Meanwhile, with the old policy statement declared unconstitutional, it can fairly be assumed that, without restraining order or injunction, defendants will put the new policies into effect.

## ORDER

It is therefore ordered that Policy Statement Number 21 is unconstitutional. The case will be closed, upon the assumption that Policy Statement Number 21 will no longer be followed, but subject to re-opening within a reasonable time if further problems arise.

REVISED POLICY STATEMENT #21

## REQUESTS FOR USE OF UNIVERSITY BUILDINGS OR UNIVERSITY PROPERTY

*Policy*

The University understands that student and faculty organizations and activities are vital to the educational process and, therefore, encourages all campus-affiliated groups to make full use of the University facilities when their meetings are part of their University work or are a logical outgrowth of it.

The University also encourages participation by the community in its programs and activities. To the extent space is available and subject to reasonable procedures for reservations, the University welcomes organizations to campus for their meetings when their work is compatible with, or supplementary to, the educational outreach of the University.

The University further recognizes, and is committed to, the benefits of an orderly process of inquiry and discussion of differing ideas and issues.

*Regulations*

A. Solicitations

(1) University buildings or campus spaces may not be used to raise money for any individual or organization other than an officially recognized campus organization, either faculty, staff or student, or a non-profit, charitable organization off campus, such as the United Way.

(2) Organizations intending to use the University's spaces to benefit an off-campus effort must be prepared to prove the tax-exempt status of the benefiting cause.

(3) Those organizations, either

(a) faculty, staff, or student, which are officially recognized as determined by the Chancellor or his representative, or

(b) non-university affiliated which are non-profit and exempt from taxation,

desiring to solicit funds must receive express, written approval for such solicitations from the University Facilities Coordinator, the Director of the Cone University Center, Room 216, Cone University Center, telephone number (704) 597-2267. The Facilities Coordinator will establish uniform procedures relating to the location, duration and set-up arrangements for such solicitation activities.

The authority to solicit by non-university affiliated organizations will be approved only for locations within the Cone University Center.

(4) University equipment (such as projectors, microphones, and tables) may not be utilized by non-university affiliated organizations, except in cases where written sponsorship of such non-university affiliated organizations has been obtained from an officially recognized campus organization.

B. Distribution of Pamphlets and Written Materials

(1) Any organization or group, whether affiliated with the University or not, may distribute in any open, exterior campus space pamphlets, booklets, brochures, and other forms of written material on the condition that such pamphlets and materials do not contain commercial solicitations or advertisements and are designed for informational (not commercial) purposes. Acceptance of donations for such material is prohibited.

(2) If, in the opinion of the University Facilities Coordinator, the pamphlets or materials being distributed are primarily intended for commercial purposes, the organization distributing such pamphlets or materials will be subject to removal from campus by the University Police. The organization may then petition the Chancellor to allow continued distribution upon a showing of the non-commercial nature of the publication.

(3) No registration or advance approval of materials is required for non-commercial distribution.

(4) In so expressing a policy of open distribution of written materials intended for non-commercial purposes, the University does not assume any obligation or responsibility for the content of the materials distributed; furthermore, the University reminds any organization so distributing materials to be aware of current laws regarding libel, defamation, obscenity, fair labor relations and other applicable laws.

C. Assemblies

(1) The University permits assemblies of groups, both university affiliated and non-affiliated, without prior written approval *only* in the Cone University Center plaza and the Residence Hall Cafeteria plaza. All such assemblies must be conducted without sound amplification equipment.

(2) Any groups desiring to obtain assembly space in any University facility or on open areas other than the plaza areas referred to in paragraph C(1) above must submit a written request, at least 48 hours in advance, to the University Facilities Coordinator, Room 216, Cone University Center, telephone number (704)597-2267.

(i) If the request is not acted upon by the Coordinator or his delegate within 36 hours, the group may assume approval; however, the group has the responsibility of inquiry to the Coordinator concerning whether the reservation has been acted upon at the end of that period.

(ii) Groups affiliated with the University shall have priority in reserving space.

(iii) Non-affiliated groups and organizations shall be required to pay the current space rental rate for the time and location approved. The Coordinator will maintain a list of all charges and rental rates approved by the Chancellor for inspection in Room 216 of the Cone University Center. The rates shall be designed to cover the entire cost of providing the facility (i. e. labor, utilities, refreshments). In addition, a refundable deposit for damage to property shall be required.

(iv) University equipment (such as projectors, microphones, and tables) may not be utilized by non-affiliated organizations, except in cases where written sponsorship of such non-affiliated organizations has been obtained from an officially recognized campus organization.

(3) Any group whose request for University space is denied by the Coordinator shall have the right to appeal that denial to the Chancellor. The Chancellor shall render a decision at least six hours before the scheduled event.